[Cite as *State v. Harris*, 2024-Ohio-1804.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio/City of Toledo

       Appellee

v.

Randell Harris

       Appellant

Court of Appeals No.  L-23-1132

Trial Court No.  CRB-23-01898

**DECISION AND JUDGMENT**

Decided: May 10, 2024

\* \* \* \* \*

Rebecca Facey, City of Toledo Prosecuting Attorney, and
Jimmie Jones, Assistant Prosecuting Attorney, for appellee.

Laurel A. Kendall, for appellant.

\* \* \* \* \*

**OSOWIK, J.**

{¶ 1} This is an appeal from a judgment of the Toledo Municipal Court, which sentenced appellant, Randell W. Harris, to 30 days in prison, suspended for one-year of active probation with conditions, after the trial court convicted him of the amended lesser-offence of menacing. For the reasons set forth below, this court affirms the trial court's judgment.

**{¶ 2}** Appellant sets forth two assignments of error in this appeal:

1. The trial court erred to the prejudice of appellant by denying the defense motion for acquittal pursuant to Crim.R. 29.

2. Appellant's conviction for menacing was not supported by the manifest weight of the evidence.

## I. Background

**{¶ 3}** This appeal originated from complaints filed by appellee, the city of Toledo/ state of Ohio, for five offenses: aggravated menacing, a violation of R.C. 2903.21(A) and a first-degree misdemeanor under R.C. 2903.21(B); obstructing official business, a violation of R.C. 2921.31(A) and a second-degree misdemeanor under R.C. 2921.31(B); two counts of menacing, each a violation of R.C. 2903.22(A) and a fourth-degree misdemeanor under R.C. 2903.22(B); and failure to disclose personal information, a violation of R.C. 2921.29(A) and a fourth-degree misdemeanor under R.C. 2921.29(B).

**{¶ 4}** Appellant pled not guilty to all charges, and discovery ensued in anticipation of a bench trial on May 8, 2023. The bench trial proceeded on three of the five charges: two counts of menacing against two Toledo police officers and one count of aggravated menacing against the victim. The trial court heard testimony from five witnesses for appellee: the victim, the victim's boyfriend, and three police officers. Appellant and his girlfriend testified in his defense. The trial court admitted one exhibit into evidence which contained four videos taken by the victim on her phone as the events with appellant unfolded through a closed door. Ultimately, the trial court found appellant not guilty of

2.

the two counts of menacing against the Toledo police officers, but found appellant guilty of one count of menacing as the lesser-included offense of aggravated menacing against the victim. The following relevant facts of the menacing conviction are in the record.

{¶ 5} On February 28, 2023, in a residential duplex in Toledo, Lucas County, Ohio, appellant, his girlfriend, and children lived above the victim, her boyfriend, and children. The Toledo police were called out to the duplex four times that day, each time in response to a report by the victim. Neither appellant nor his girlfriend called the police that day. The first police call out was coded a neighbor dispute; the second and third calls were for menacing; and the fourth call was for weapons. Toledo police arrested appellant on the fourth visit. According to Toledo police officer McConnell, who was dispatched to the duplex four times on February 28, she consistently observed the victim was scared, flustered and agitated while appellant was consistently aggressive and angry.

{¶ 6} The victim recorded four video clips of appellant's conduct through a closed door, and the videos were entered into evidence without objection. After the four video clips were played in court, the victim was asked "how did all of those statements and Mr. Harris' behavior make you feel?" The victim responded, "Scared, threatened. And I still feel scared. Because he's telling me that his family is ex-gangbangers and he got bodies. I went and got security cameras put in. Got my locks changed; all that. He told me every way (sic.) to get into my house. He's been living there for three years. Yeah, I'm terrified."

3.

{¶ 7} The origin of the first police call-out is disputed by the parties, as each accuses the other as the instigator.

{¶ 8} According to the victim, she heard a "big bang * * * [l]ike somebody was stomping on the ceiling." The victim explained, "I've lived in apartments before. And I know that if you're too loud, somebody will bang on your ceiling for you to like quiet down." The victim went upstairs to investigate the bang and to address any concerns about her kids being too loud. Appellant was immediately hostile towards the victim: "He started to tell me how he was an ex-gangbanger. That he has bodies. He did a bid in jail. Like trying to intimidate me basically. And how he has guns."

{¶ 9} While the victim retreated to her unit, she heard appellant yelling unkind comments about her eight-year-old daughter's size. The victim told appellant, "Worry about your own kids. Don't worry about mine." The victim entered her unit, closed the door, and through the closed door heard appellant scream towards her, "I have a Ruger for her baby daddy when he gets home." The victim's boyfriend was at work. The victim called the police.

{¶ 10} According to Toledo police officer Jackson, who was dispatched to the duplex three times on February 28, at this first call out, he spoke with appellant who opened his apartment door, but would not allow police entry. Appellant was very agitated and confrontational when Officer Jackson advised him "to leave his neighbor be. You know, stop the argument." Appellant was argumentative about the advice "to work as neighbors and whatnot" because "he made statements * * * this is his place. He owns it.

4.

He's been here longer." Appellant "solely believed that because he lived at that apartment complex longer, that he was going to run that place."

{¶ 11} Appellant's version of the first incident is different. He never threatened harm to the victim. Rather, the victim threatened him and his girlfriend, and he feared for his family's safety. The victim, uninvited, stomped upstairs to his apartment door with a gun at her waist and her phone, and "when she banged, on the door, she said is there a problem?" Appellant politely opened his door. In response to the victim accusing his two-year-old of running around, appellant told the victim that her eight-year-old, "I don't know if it was a little boy or a little girl," plays loudly at the bottom of the stairs. Although the victim "threatened to shoot through our door with our kids in it," neither appellant nor his girlfriend called the police. Appellant said he diffused the situation. "So what we did was like – I was like well, can you take your – you know, yourself back down to your unit?" The victim retreated, and then the family prepared to go shopping. His girlfriend and children went shopping while he remained behind, and then the Toledo police arrived.

> All of a sudden the officer was like, oh, excuse me. Y'all the neighbors that stay with them (sic.)? I'm like, yes. It was like – they was (sic.) like, what's going on? We was (sic.) so confused. Because we didn't know what was going. We know that she had just did that. She came upstairs with the gun on her waist. You know, talking like that. * * * [O]nce the police asked what was going on – that's why they like – they

literally just did like this. Like um, is everything all right? Anything going on? And we was (sic.) like nah. You know, not that we know of. That's how were literally, like no, not that we know of.

{¶ 12} The second, third, and fourth police visits were not specifically addressed by appellant other than a blanket denial of wrongdoing. Appellant denied any video clips contain his voice and suggested the victim edited her videos because "she didn't clarify that this was enticing. The whole thing about this story will be what did you do to entice this?"

{¶ 13} According to the victim, the second police visit occurred after she ordered food for delivery. When the DoorDash delivery driver arrived at the duplex, the victim came out of the unit to obtain the delivery. At that time, appellant opened his door and pointed a gun down the stairs towards the front door where the victim was interacting with the delivery driver. Appellant yelled at the victim while he pointed the gun, "b*tch, you ready to die?" The victim ran back to her apartment, and the delivery driver ran to her car to call the police. The delivery driver did not testify at the trial. Officer Jackson testified that this time, appellant "wouldn't even come outside the door. He just would yell outside, from the door, to talk to us that way." The police eventually left again. The victim called her boyfriend at work to come home.

{¶ 14} The third police visit occurred after appellant came down the stairs and sat on the steps outside of the victim's unit. The victim recorded appellant outside her door: "He's outside cocking the gun at the – you can hear it on the tape. He's cocking the gun

6.

outside my door." The victim called the police, who arrived at the same time the victim's boyfriend arrived. At trial, and based on Officer McConnell's firearms training, she recognized the sound of "racking a gun" in the video clip. Appellant retreated to his unit and, again, refused to cooperate with the police. Before the police left, they advised the victim and her family to find another place for the night.

{¶ 15} The fourth police visit occurred after the victim's family prepared to go away for the night. Appellant banged on the victim's door yelling, "Headshot, b*itch." Appellant also yelled for the victim to come out with a gun. "It just seemed like he wanted to do a shootout. I wasn't coming out with a gun. I got kids." The victim's boyfriend testified hearing appellant yell, "head tap shorty," which he took as a direct threat to shoot him in the head through the closed door. The victim's boyfriend retrieved his gun because "sh*t was about to be up" due to appellant's threats. "If somebody said they want to see physical shoot (sic.) through the door, what I'm (sic.) supposed to do?" The door remained closed, and the victim called the police, who arrived at the same time as appellant's girlfriend.

{¶ 16} Officer Jackson commanded appellant come down the stairs, and he was arrested when he opened the door to his girlfriend. "We don't know if he had a pistol or any type of weapon on him. So we took him into custody for officer safety and his safety. So even at that time, he was still super agitated, aggressive. Making statements towards officers of what I can remember from it. * * * Just threatening statements. Continued all

7.

the way, you know, through the – well, my whole encounter with him. Continued the entire encounter."

{¶ 17} Appellant's girlfriend testified the police "followed behind me and asked me, can we just come and look. And of course, I * * * allowed them. * * * I * * * gave them permission." According to Toledo police officer Coats, who had been dispatched to the duplex four times on February 28, after appellant was taken into custody, he was part of the team to conduct "a quick sweep to verify if there was a firearm or not" that lasted about five minutes. No firearm was found, but "we didn't check every – every area of the apartment."

{¶ 18} Procedurally, after appellee rested its case, appellant orally moved for Crim.R. 29 acquittal. Appellant argued appellee could not meet its burden for three reasons: (1) the police found no firearm on appellant or in appellant's apartment; (2) the victim's videos do not show appellant was in the hallway outside the victim's door; and (3) the videos do not clearly show that appellant "was the one initiating contact, between himself and the alleged victim, in this case." Appellee opposed the motion. Upon due consideration of all the arguments, the trial court denied appellant's motion for acquittal, and the trial continued with appellant's defense.

{¶ 19} After appellant rested his defense, the bench trial recessed until May 23, 2023, at which time the trial court found appellant not guilty of the two menacing offenses against the police officers and, after amending the aggravated menacing offense to the lesser-included offense of menacing the victim, found appellant guilty of that

8.

offense. The trial court then sentenced appellant to a 30-day jail term, suspended, with one-year of active probation, including anger management and no contact with the victim.

{¶ 20} Appellant timely appealed.

## II. Sufficiency of Evidence

{¶ 21} Appellant's first assignment of error argues appellee failed to meet its burden to produce sufficient evidence to convict him of menacing for four reasons: (1) he denied threatening the victim, which his girlfriend corroborated; (2) he denied that it is his voice recorded in the video clips; (3) he and his girlfriend testified the victim, armed with a firearm, threatened his family; and (4) he and his girlfriend testified they feared for their and their family's safety. Appellant argues the trial court abused its discretion when it denied his Crim.R. 29(A) motion for acquittal, and his conviction should be reversed for insufficient evidence.

{¶ 22} In response, appellee argues it introduced sufficient evidence of appellant menacing the victim. The victim identified appellant as the person who came to the door, pointed a gun at her, and told her "are you ready to die?" Appellant's actions terrified her.

{¶ 23} Crim.R. 29(A) states, in part, "The court on motion of a defendant * * *, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment * * *, if the evidence is insufficient to sustain a conviction of such offense or offenses." Appellant's motion for acquittal under

9.

Crim.R. 29(A) is governed by the same standard as a challenge to the sufficiency of evidence supporting a conviction at trial. *State v. Tenace*, 2006-Ohio-2417, ¶ 37.

> The test for sufficiency of the evidence is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." "'Proof beyond a reasonable doubt' is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of the person's own affairs." A sufficiency-of-the-evidence challenge asks whether the evidence adduced at trial "is legally sufficient to support the jury verdict as a matter of law." (Citations omitted.)

*State v. Worley*, 2021-Ohio-2207, ¶ 57. In construing Crim.R. 29(A), the Ohio Supreme Court states that denial is proper even if reasonable minds reach different conclusions whether each element of the crime was proven beyond a reasonable doubt where "they clearly *might* find guilt." (Emphasis sic.). *State v. Bridgeman*, 55 Ohio St.2d 261, 264, (1978).

{¶ 24} With respect to the elements of menacing, R.C. 2903.22(A)(1) provides, "No person shall knowingly cause another to believe that the offender will cause physical harm to the person or property of the other person, * * * or a member of the other person's immediate family."

10.

{¶ 25} At the point appellant made his motion for acquittal, he and his girlfriend had not yet testified to directly contradict the prosecution's evidence, which is the basis of support for this assignment of error. Any rational trier of fact viewing the evidence in a light most favorable to appellee when appellee rested its case, could have found the essential elements of menacing proven beyond a reasonable doubt. The victim testified about appellant's hostilities towards her, both verbal and with a firearm. She was scared that she would be physically harmed by appellant when he pointed a gun at her and announced he would shoot her. Admitted into evidence were four video clips where the victim identified appellant's voice issuing threats of physical harm to the victim and her family. Police officers identified appellant and testified they arrived four times to the duplex, ultimately leading to appellant's arrest. With each interaction, two police officers described appellant as aggressive, angry, agitated, and confrontational. These officers also described the victim as scared and afraid of appellant.

{¶ 26} Based on the foregoing, we find that sufficient evidence was submitted to the fact-finder at the close of appellee's case such that, after viewing the evidence in a light most favorable to appellee, any rational trier of fact could have found the essential elements of the crime of menacing the victim.

{¶ 27} Appellant's first assignment of error is not well-taken.

### III.  Manifest Weight of the Evidence

{¶ 28} In support of his second assignment of error, appellant argues his convictions should be reversed because he contradicted appellee's evidence relied upon

by the trial court. Appellant argues he provided evidence that he: did not initiate any contact with the victim; did not threaten the victim in any manner; and did not pull out any firearm that day or point it at the victim, and the subsequent police search found no firearm. Appellant argues the victim, instead, pointed a firearm at his door and made threats.

{¶ 29} In response, appellee argues that the fact finder did not clearly lose his way such that the conviction must be reversed and a new trial ordered. Appellee argues appellant's conviction is not against the manifest weight of the evidence simply because appellant states the offense did not happen. Appellee points to the evidence introduced at trial to support appellant's conviction for menacing. Citing to *State v. Williams*, 2009-Ohio-3237, ¶ 17 (10th Dist.), appellee further argues that a conviction is not against the manifest weight of the evidence simply because the fact-finder believed one witness' testimony instead of another's.

{¶ 30} "To evaluate a manifest-weight claim, we must review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of all the witnesses." *State v. McKelton*, 2016-Ohio-5735, ¶ 328. We must decide if the jury clearly lost its way in resolving conflicts in the evidence to create a manifest miscarriage of justice such that the conviction must be reversed and a new trial ordered. *Id.* A manifest-weight claim questions the effect of the evidence in inducing belief of appellant's guilt by questioning whether the jury could find the inclination of a greater amount of credible evidence was admitted at trial to sustain that decision than not. *State v. Thompkins*, 78

12.

Ohio St.3d 380, 387 (1997). The discretionary power to grant a new trial is in the exceptional case in which the evidence weighs heavily against the conviction. *Id.* The unanimous concurrence of all three judges of a court of appeals panel is required to overturn, on the weight of evidence, a judgment that results from a jury. *Id.* at 389. Appellant does not meet his burden.

{¶ 31} In light of the testimony and evidence previously discussed, we find that any rational fact-finder could have found the inclination of a greater amount of credible evidence was admitted at trial than not to induce the fact-finder's belief of appellant's guilt for menacing the victim. We find no exceptional instance from the record where the evidence admitted at trial weighs heavily against the conviction. Just because appellant and his girlfriend testified they feared for their safety from the victim and that appellant's conduct that day was peaceful does not mandate the fact-finder believe them. Appellant did not call the police fearing for his safety; rather, the victim repeatedly called. When the police arrived four times at his residence on February 28, each time he refused to cooperate with them rather than seek their protection. The victim and the victim's boyfriend testified as to appellant's threats to shoot appellant or her family. The victim testified she was terrified by appellant's conduct. We find the admitted evidence supports inducing a fact-finder's belief of appellant's guilt that appellant knowingly caused the victim to believe that appellant will cause physical harm to her, to her property, or to a member of her immediate family. We do not find the jury clearly lost its way in resolving

13.

conflicts in the evidence to create a manifest miscarriage of justice such that the conviction must be reversed and a new trial ordered.

{¶ 32} Appellant's second assignment of error is not well-taken.

### IV.  Conclusion

{¶ 33} On consideration whereof, the judgment of the Toledo Municipal Court is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.  *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.                    _____
                                                                 JUDGE
Gene A. Zmuda, J.

Myron C. Duhart, J.                     _____
CONCUR.                                                   JUDGE

                                                   _____
                                                                 JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.